1

2   JEROME R. AIKEN (WSBA NO. 14647)
    Meyer, Fluegge & Tenney, P.S.          **Honorable Salvador Mendoza, Jr.**
3   230 S. Second Street / P.O. Box 22680
    Yakima, WA  98907-2680
4   Phone:  (509) 575-8500
    Email:  aiken@mftlaw.com
5

6   Attorneys for Plaintiffs James Blais and Gail Blais

7

8                  UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF WASHINGTON
9

10  JAMES BLAIS and GAIL BLAIS,        )
                                       )   NO. 20-CV-00187-SMJ
11              Plaintiffs,            )
                                       )   PLAINTIFFS' AMENDED MOTION
12        vs.                          )   FOR PRELIMINARY AND
                                       )   PERMANENT INJUNCTION
13                                     )
    ROSS HUNTER, in his official       )
14  capacity of Secretary of Washington )  Hearing: August 25, 2020
    State Department of Children, Youth )  Oral Argument Requested
15  and Families,                      )
                                       )
16              Defendant.             )
                                       )
17  _____ )

18

19

20

21

22

23

**Amended Motion for Preliminary**
**and Permanent Injunction**

LAW OFFICES OF
**MEYER, FLUEGGE & TENNEY, P.S.**
230 South Second Street · P.O. Box 22680
Yakima, WA 98907-2680
Telephone (509) 575-8500

# I.    INTRODUCTION

Plaintiffs James and Gail Blais are ready and able to provide a loving home to foster children, including their infant great-granddaughter, H.V., who now is in custody of the state of Idaho. However, the Washington State Department of Children, Youth, and Families, led by Defendant Ross Hunter (collectively, the "Department"), has denied the Blaises' foster parent license application forcing them into an impossible choice: abandon their sincerely-held religious beliefs or lose the opportunity even to be considered as foster parents, including for their own great-granddaughter. The Blaises thus seek a preliminary injunction enforcing their First and Fourteenth Amendment rights. After undergoing the Department's licensing procedures, the Blaises have proven qualified to be foster parents, and there is no question they would be loving guardians to H.V. But the Department denied the Blaises application because it did not like their response to what they would do if, fifteen years down the road, H.V. identified as lesbian or transgender. The Blaises responded that they would love and support H.V., regardless of her identity, and respond to her needs—including with professional treatment where appropriate—in ways consistent with then-current medical standards and their religious beliefs.

The Department's denial violates the Blaises' constitutional rights in multiple ways. First, the Free Exercise Clause holds that when the government is making case-by-case decisions, it must account for religious exercise in that process. When it burdens religious exercise, its decision faces strict scrutiny. Here, the Department's policy of asking potential foster parents how they would support

1    children identifying as lesbian, gay, bisexual, transgender, or questioning

2    (LGBTQ+)—a practice just initiated in January, the same month the Blaises filed

3    their application—creates a system of individualized assessments resolved at the

4    Department's sole discretion, thus triggering the heightened review. The

5    Department cannot survive that standard. It lacks a compelling interest in requiring

6    potential foster parents to affirm now what they would do in a complex,

7    hypothetical situation in the future for which even the Department itself does not

8    have a fixed standard. And even if the Department had a compelling interest, its

9    decision to completely bar the Blaises from being foster parents, especially for

10    their own great-granddaughter, is the *most*, not *least* restrictive approach toward

11    religion. The denial thus violated the Free Exercise Clause.

12        Also, the Department's insistence that the Blaises make avowals now, in

13    violation of their religious beliefs, about future, hypothetical situations constitutes

14    unlawful coercion on the Blaises to abandon their religious beliefs and to speak

15    against their will in violation of their free exercise and free speech rights.  For all

16    these reasons, the Blaises are likely to prevail on the merits of their claims

17        The other relevant considerations also favor a preliminary injunction.  The

18    infringement of constitutional rights for any length of time constitutes irreparable

19    harm as a matter of law. Moreover, denial of the Blaises' application means that

20    they will forever lose the opportunity to foster, and eventually adopt, their own

21    great-granddaughter. Conversely, there are no harms to the Department or its

22    interests. The Department has never disputed that the Blaises would be loving and

23    capable guardians for H.V. And an injunction would not force the Department to

**Amended Motion for Preliminary**
**and Permanent Injunction - 2**

LAW OFFICES OF
**MEYER, FLUEGGE & TENNEY, P.S.**
230 South Second Street · P.O. Box 22680
Yakima, WA 98907-2680
Telephone (509) 575-8500

1    place children with the Blaises who may not, from the Department's perspective.

2    be a good fit. Finally, the public interest always lies with protecting constitutional

3    rights, especially those intertwined with preserving family relationships.

4    ## II.    FACTUAL BACKGROUND

5    The Blaises are observant members of the Seventh-day Adventist faith (Joint

6    Decl. of James and Gail Blais, ¶ 2). Their faith places a strong emphasis on family

7    life. (*Id.* ¶ 3.) Seventh-day Adventists believe that parents "must gain a

8    sympathetic understanding of their [children's] problems, seek to provide for them

9    a Christian social environment, and spiritually draw near them so [they] can impart

10   the ideals, inspiration, and power of Christianity." *Seventh-day Adventist Church*

11   *Manual* (19th ed. 2015) at 152; (Blais Decl. ¶ 4).

12   As followers of Jesus, church members believe all people are created in the

13   image of God and must be treated with dignity and respect. This includes

14   individuals of all sexual orientations and those with gender dysphoria. The Bible

15   commands: "You shall love your neighbor as yourself." (*Id.* ¶ 5.) Seventh-day

16   Adventists also believe that Scripture provides guidance to those who experience

17   incongruity between their biological sex and gender identity. As with all facets of

18   daily existence, Seventh-day Adventists seek guidance from God through Scripture

19   to determine what is in their best interest and to live according to His will. (2 Tim

20   3:16); (*Id.* ¶ 6).

21   The Department administers the State's foster licensing and placement

22   program under standards set forth in the Washington code. *See, e.g.*, WAC 110-

23   148-1300, -1315(1), -1320. -1365 & -1375. Washington law also specifies the

**Amended Motion for Preliminary**
**and Permanent Injunction - 3**

LAW OFFICES OF
**MEYER, FLUEGGE & TENNEY, P.S.**
230 South Second Street · P.O. Box 22680
Yakima, WA 98907-2680
Telephone (509) 575-8500

post-licensing services that foster parents must provide to children in their care. WAC 110-148-1520. There is nothing in Washington law that requires the Department to impose licensing requirements beyond those set forth in the regulations. And there is nothing under Washington law that imposes as a separate licensing requirement that prospective applicants must avow how they would care for hypothetical children fifteen years from the date of their application.

In July 2018, the Department enacted Policy 6900 to address the needs of children and youth discovering or identifying themselves as LGBTQ+ and to "provide guidance to assist CA staff in identifying and referring LGBTQ+ children and youth to appropriate and culturally responsive services." Under this policy, Department caseworkers are to "[c]onsider the child or youth's LGBTQ+ identity as a factor *when making placement decisions*," which includes "[d]etermining, on a case-by-case basis, which placement option would be in the child or youth's best interest for their safety and well-being." Department Policy 6900 Procedure 2.a. [Doc. 26-1]. On its face, Policy 6900 does not apply to the Department's licensing requirements, does not impose any separate licensing requirements, and does not authorize the Department to impose any of the Policy's caseworker mandates on prospective foster parents.

In December 2019, the Blaises began pursuing their goal of fostering, and perhaps adopting. H.V. after she was removed from her parents' care as a newborn. They took Department-mandated training and orientation programs, completing several required certification courses. They began the licensing process and welcomed social workers in to inspect their home. They went through numerous

**Amended Motion for Preliminary and Permanent Injunction - 4**

LAW OFFICES OF
**MEYER, FLUEGGE & TENNEY, P.S.**
230 South Second Street · P.O. Box 22680
Yakima, WA 98907-2680
Telephone (509) 575-8500

1  interviews with Department personnel. During all of these interviews, the

2  Department personnel were aware that James and Gail Blais are observant

3  Seventh-day Adventists. (Blais Decl. ¶ 10.)

4          During the first interview in January 2020 (when H.V. was only four months

5  old), the Blaises were extensively questioned about hypothetical issues related to

6  H.V.'s possible future sexual orientation and gender identity. These questions

7  included such things as:

8          •       How would the Blaises react if H.V. were a lesbian?

9          •       Would the Blaises allow H.V. to have a girl spend the night at their

10                 home as H.V.'s romantic partner?

11         •       If at 15 years old, H.V. wanted to undergo hormone therapy to

12                 change her sexual appearance, would the Blaises support that

13                 decision and transport her for those treatments?

14         •       If as a teenager, H.V. wanted to dress like a boy and be called by a

15                 boy's name, would the Blaises allow her to   act in that manner?

16  (*Id.* ¶¶ 9 & 11.)

17         The Blaises responded to these questions openly, honestly and in a manner

18  consistent with their religious beliefs. They made clear that, as Seventh-day

19  Adventists, they believe it is important and part of their Christian obligation to love

20  and support all, particularly youth who may feel isolated or uncomfortable because

21  of who they are, including because of their sexual orientation or gender identity.

22  The Blaises stated that they would provide a supporting and loving home for any

23

**Amended Motion for Preliminary
and Permanent Injunction - 5**

LAW OFFICES OF
**MEYER, FLUEGGE & TENNEY, P.S.**
230 South Second Street · P.O. Box 22680
Yakima, WA 98907-2680
Telephone (509) 575-8500

1  child placed under their care—and particularly their own family member—

2  regardless of how that child may identify. (*Id.* ¶¶ 12 & 27.)

3        With regard to the hypothetical questions concerning possible hormone

4  therapy, the Blaises responded that although they could not support such

5  treatments based on their sincerely held religious convictions, they absolutely

6  would be loving and supportive of H.V. (*Id.* ¶ 13.) In the unlikely event H.V. may

7  develop gender dysphoria (or any other medical condition) as a teenager, the

8  Blaises were clear that they would provide her with loving, medically and

9  therapeutically appropriate care, consistent with both then-accepted medical

10  principles and their beliefs as Seventh-day Adventists and Christians.  (*Id.* ¶¶ 14,

11  27.) The Blaises made clear that they are aware of and recognize the special needs

12  of LGBTQ+ children and understand the importance of not rejecting these

13  individuals for who they are. (*Id.* ¶ 27.)

14        The Department licensor responded that the Blaises' answers were

15  inconsistent with the Department's policy regarding LGBTQ+ youth. (*Id.* ¶ 15.)

16  The licensor later asked the Blaises to review Department materials so that they

17  might "make a more informed decision about supporting LGBTQ+ youth in foster

18  care." (*Id.* ¶ 16.) The Blaises complied, but again expressed their faith-based

19  conviction that they could not support hormone treatment for transition purposes.

20  (*Id.* ¶ 17.) They also repeated their commitment to provide H.V. with the most

21  loving home that they can, regardless of her potential sexual orientation or identity.

22        In February 2020 (when H.V. was 5 months old), the Department licensor

23  interviewed the Blaises a second time and asked many of the same kinds of

**Amended Motion for Preliminary
and Permanent Injunction - 6**

LAW OFFICES OF
**MEYER, FLUEGGE & TENNEY, P.S.**
230 South Second Street · P.O. Box 22680
Yakima, WA 98907-2680
Telephone (509) 575-8500

1  hypothetical questions related to H.V.'s possible sexual orientation and gender

2  identity when should would be a teenager. (*Id.* ¶ 19.) The Blaises gave similar

3  answers based on their religious convictions. In response, the Department licensor

4  stated that they should drop their request to become licensed foster parents because

5  their views about handling H.V.'s possible future gender identity issues were

6  inconsistent with the Department's policy. The Blaises refused to change their

7  responses and did not withdraw their foster parent application. (*Id.* ¶¶ 20-21.)

8  Although the Blaises very much want to be foster parents, they are not willing to

9  avow support for future hypothetical situations in violation of their sincerely held

10 religious beliefs just to secure a foster license from the Department. (*Id.* ¶ 28.)

11      The Blaises sat for yet a third Department interview in March 2020, this

12 time with the Department licensor and the Department's LGBTQ+ lead. Once

13 again, the sole focus of the interview questions was whether the Blaises would

14 avow support for H.V. hypothetical choices, should she possibly identify as lesbian

15 or transgender as a teenager. Once again, the Blaises cooperated fully during the

16 third interview and again responded to all of the questions honestly and in a

17 manner consistent with their religious beliefs.

18      On June 16, 2020—approximately six months after first expressing their

19 interest in becoming foster parents—the Department denied the Blaises'

20 application, cutting them off from any opportunity to care for their great-

21 granddaughter. (*Id.* ¶ 26.) According to the Department's written decision, the fact

22 that the Blaises cannot support the Department's LGBTQ+ policy "because it does

23 not align with their faith" means that they do not meet the Department's minimum

**Amended Motion for Preliminary
and Permanent Injunction - 7**

LAW OFFICES OF
**MEYER, FLUEGGE & TENNEY, P.S.**
230 South Second Street · P.O. Box 22680
Yakima, WA 98907-2680
Telephone (509) 575-8500

licensing requirements. Therefore the Blaises are unable to provide foster care for their own great-granddaughter or a loving home for any child in Washington State.

### III.    LEGAL STANDARD

To obtain preliminary injunctive relief, plaintiffs must establish that they are "likely to succeed on the merits," that they are "likely to suffer irreparable harm in the absence of preliminary relief," that "the balance of equities tips in [their] favor," and that "an injunction is in the public interest." *Am. Trucking Assn's, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (citation omitted). Each of these factors weighs decisively in the Blaises' favor.

### IV.    ARGUMENT

**A.    The Blaises Are Likely To Succeed on the Merits.**

The Blaises have a strong likelihood of succeeding separately on each of their free exercise, free speech claims.

**1.    The Blaises Will Likely Prevail on Free Exercise.**

In *Employment Division v. Smith*, the Supreme Court held that strict scrutiny did not apply to laws that are neutral and generally applicable. 494 U.S. 872 (1990). But it still does apply "'in a context that len[ds] itself to individualized governmental assessment of the reasons for the relevant conduct." *Stormans, Inc. v. Weisman*, 794 F.3d 1064, 1081 (9th Cir. 2015) (quoting *Smith*, 494 U.S. at 884). Where applicable rules give government officials "unfettered discretion" that is not "tied to particularized, objective criteria," the heightened review is triggered. *Id*. at 1081-82.

**Amended Motion for Preliminary and Permanent Injunction - 8**

LAW OFFICES OF
**MEYER, FLUEGGE & TENNEY, P.S.**
230 South Second Street · P.O. Box 22680
Yakima, WA 98907-2680
Telephone (509) 575-8500

1    Such is the case here. Washington law nowhere requires potential foster

2  parents to avow how they would care for hypothetical children 15 years from the

3  date of their application as a condition for being licensed. Rather, the law provides

4  that the Department may later consider such issues in determining appropriate

5  child placements. Even then, related inquiries of foster parents are entirely

6  discretionary. The Department's guidance states that caseworkers are not required

7  to probe about how potential foster parents might respond to hypothetical

8  LGBTQ+ issues and, if caseworkers do, it is within their discretion to decide

9  whether placement should move forward. [Doc. 20-2 at 1] (Disclaimer Statement);

10  [Doc.. 25 at 11]. This unfettered discretion was exemplified by the Departments'

11  interactions with the Blaises and the Department's continuous back and forth about

12  whether the Blaises' responses were sufficiently compliant.

13    Strict scrutiny is "the most demanding test known to constitutional law."

14  *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997). Under that test, the

15  government must demonstrate that the Rule furthers an interest "of the highest

16  order." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520,

17  546 (1993). It must make this showing not "in the abstract" but "in the

18  circumstances of this case." *Cal. Democratic Party v. Jones*, 530 U.S. 567, 584

19  (2000). And it "must show by specific evidence that [Plaintiffs'] religious practices

20  jeopardize its stated interests." *Merced v. Kasson*, 577 F.3d 578, 592 (5th Cir.

21  2009). It cannot do so here.

22    First, the Department lacks a compelling government interest in requiring

23  the Blaises to avow in advance how they would respond to specific complex

**Amended Motion for Preliminary**
**and Permanent Injunction - 9**

LAW OFFICES OF
**MEYER, FLUEGGE & TENNEY, P.S.**
230 South Second Street · P.O. Box 22680
Yakima, WA 98907-2680
Telephone (509) 575-8500

1   hypotheticals such as whether they would allow a foster child to have intimate

2   sleepovers or to pursue gender transition treatments at age 15. Rather, the

3   government must "identify an 'actual problem' in need of solving" and cannot rely

4   merely on "a predictive judgment" about what may happen. *Brown v. Entm't*

5   *Merchants Ass'n*, 564 U.S. 786, 799 (2011). Here, the Blaises have already

6   affirmed that they would love and support any child in their care, regardless of the

7   child's sexual orientation or gender identity, and that they would respond to more

8   specific concerns consistent with then-current medical guidance and their own

9   religious beliefs. This is the same standard that millions of birth and foster parents

10  apply to their children. The Department has a high burden to show that it has

11  compelling interest in subverting these standards based on hypothetical facts that

12  may never occur.

13      And there are other obstacles to meeting this standard as well. For example,

14  the statements demanded from the Blaises are inconsistent with the Department's

15  own practices. For example, regarding dating, the Department requires only that

16  foster parents apply to foster children same standard applied to other children in

17  their care, regardless of the sex or sexual orientation of the foster child's boyfriend

18  or girlfriend. McKeown Decl. [Doc. 23, ¶ 25]. The Department does not set the

19  standard that all children in the home have a right to engage in sexual relationships

20  by age 15. And with respect to gender transitioning, state law forbids foster parents

21  from making such significant decisions without first consulting with the

22  Department—which has ultimate responsibility for major medical decisions for

23  foster children. WAC 110-148-1520(5).  It is the Department's burden to show that

**Amended Motion for Preliminary**
**and Permanent Injunction - 10**

LAW OFFICES OF
MEYER, FLUEGGE & TENNEY, P.S.
230 South Second Street · P.O. Box 22680
Yakima, WA 98907-2680
Telephone (509) 575-8500

1    its interest in having the Blaises now avow a particular approach is so compelling

2    as to justify overriding their religious beliefs. Considering the Department's urgent

3    need for more, not fewer, foster families, this burden cannot be met.

4         Even assuming a compelling government interest, there are many ways the

5    Department could meet that interest in ways much less restrictive to religion. This

6    "less-restrictive means standard is exceptionally demanding"—"'[i]f a less

7    restrictive means is available for the Government to achieve its goals, the

8    Government must use it.'" *Holt v. Hobbs*, 574 U.S. 352, 365 (2015) (citations

9    omitted). And, again, it is the Department's burden "to demonstrate that no

10   alternative forms of regulation" would suffice "without infringing First

11   Amendment rights." *Sherbert v. Verner*, 374 U.S. 398, 407 (1063). Failure to

12   carefully all available options is itself a fatal error.

13        Numerous available alternatives were not considered. As set forth in

14   Washington law, the Department could address LGBTQ+ concerns at the

15   placement stage, rather than at licensing. WAC 110-148-1520. It could address the

16   issue at a later, more appropriate age. It could rely on caseworkers to carry out

17   medical decisions that the Blaises cannot support for religious reasons. Or it could

18   change placements in the rare situation where the Blaises might be unable,

19   consistent with the religious beliefs, to carry out the Department's decisions with

20   respect to a particular child. Because the Department has these less restrictive

21   means available to it, the Blaises are strongly likely to succeed on the merits of

22   their claims for violation of the Free Exercise Clause of the First Amendment.

23

**Amended Motion for Preliminary**
**and Permanent Injunction - 11**

LAW OFFICES OF
**MEYER, FLUEGGE & TENNEY, P.S.**
230 South Second Street · P.O. Box 22680
Yakima, WA 98907-2680
Telephone (509) 575-8500

1      The Blaises are likely to prevail on the free exercise claim for an additional

2  reason. Considering the many options, the Department has to pursue its interests

3  without the Blaises' avowal of support, the denial of their application to foster in

4  any circumstance is nothing more than a penalty on their religious beliefs.

5  Changing their responses to state, for example, that they would allow their great-

6  granddaughter 15 years in the future to have a girlfriend spend the night or to

7  undergo hormone therapy would have no practical effect, except to demonstrate a

8  disavowal of their religious beliefs. But "the First Amendment 'obviously excludes

9  all governmental regulation of religious *beliefs* as such,' meaning that 'the

10  government may not . . . punish the expression of religious doctrines it believes to

11  be false [or] impose special disabilities on the basis of religious views or religious

12  status." *Parents for Privacy v. Barr*, 949 F.3d 1210, 1233 (9th Cir. 2020) (internal

13  quotation marks & citation omitted). *See Torcaso v. Watkins*, 367 U.S. 488 (1961)

14  (abolishing test oath); *McDaniel v. Paty*, 435 U.S. 618 (1978) (plurality opinion

15  invalidating exclusion of clergy from legislature). Such governmental regulation of

16  religious beliefs is "never permissible." *Church of Lukumi Babalu Aye, Inc. v. City

17  of Hialeah*, 508 U.S. 520, 533 (1993); *see also Everson v. Board of Ed. of Ewing*,

18  330 U. S. 1, 16 (1947) (state "cannot exclude individual[s] Catholics, Lutherans,

19  Mohammedans, Baptists, Jews, Methodists, Non-believers, Presbyterians, or the

20  members of any other faith, because of their faith, or lack of it, from receiving the

21  benefits of public welfare legislation").

22      These protections have special force in the context of religious beliefs about

23  marriage, family, and children—an area where the Supreme Court repeatedly has

LAW OFFICES OF
**MEYER, FLUEGGE & TENNEY, P.S.**
230 South Second Street · P.O. Box 22680
Yakima, WA 98907-2680
Telephone (509) 575-8500

rebuked efforts to compel conduct at odds with one's religious beliefs. *See, e.g.*, *Wisconsin v. Yoder*, 406 U.S. 205 (1972) (no compelling interest in forcing Amish parents to violate their way of life and send their children to public high school); *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 138 S. Ct. 1719, 1727 (2018) (acknowledging that clergy licensed by the state to perform marriages may refuse to perform same-sex weddings); *Pierce v. Society of Sisters*, 268 U.S. 510, 531-32 (1925) (religious order constitutionally protected to provide religious education to orphans in their care).

Here, the State's repeated and remarkable efforts to "reeducate" the Blaises and force them to renounce their religious beliefs is further evidence that the State was targeting the Blaises' beliefs as such. By its denial of the Blaises' application, the Department has made clear that, in order to secure a foster parent license, applicants must divorce themselves from any religious belief that conflicts with the State's policy preference with regard to rearing LGBTQ+ children. "Placing such a condition on benefits or privileges 'inevitably deters or discourages the exercise of First Amendment rights.'" *Espinoza v. Montana Dept. of Rev.*, No. 18-1195, slip op. at 11 (S. Ct. June 30, 2020) (quoting *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2022 (2017)).

The Department's posture puts the Blaises in an intolerable dilemma: the only way to secure a State foster parent license is for them to tell the Department that they will follow the commands of the Department's LGBTQ+ policy and thus repudiate the dictates of their sincerely held religious beliefs. And although the Blaises remain free to continue to adhere to their beliefs as Seventh-day

LAW OFFICES OF
**MEYER, FLUEGGE & TENNEY, P.S.**
230 South Second Street · P.O. Box 22680
Yakima, WA 98907-2680
Telephone (509) 575-8500

Adventists, "that freedom comes at the cost of automatic and absolute exclusion from the benefits of a public program for which [they are] otherwise fully qualified. And when the State conditions a benefit in this way . . . the State has punished the free exercise of religion." *Trinity Lutheran*, 137 S. Ct. at 2022; *see Sherbert v. Verner,* 374 U.S. 398, 404 (1963) ("It is too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege.")

The Blaises are not claiming an entitlement to secure a state license to be a foster parent solely because they are H.V.'s biological family. Instead, they seek nothing more than the constitutionally protected right to be considered for such a license without having to disavow their sincerely held religious beliefs. But that is the opposite of what occurred here. As stated by the Department, the only reason for their disqualification is their sincerely held religious beliefs and the fact that such beliefs do not align with the Department's policy. In short, but-for the Blaises' refusal to back away from their religious convictions, the Department found no impediment to approving their foster parent license application. This conclusion expressly conditions the Blaises' ability to secure such a license on their "willingness to surrender" their religious beliefs. *Trinity Lutheran*, 137 S. Ct. at 2022 (quoting *Church of Lukumi Babalu Aye* 508 U.S. at 533). Such a position "is odious to our constitution . . . and cannot stand." *Id.* at 2025. "The Free Exercise Clause protects against even 'indirect coercion.'" *Espinoza*, slip op. at 11(quoting *Trinity Lutheran*, 137 S. Ct. at 2025).

/ / /

**Amended Motion for Preliminary**
**and Permanent Injunction - 14**

LAW OFFICES OF
**MEYER, FLUEGGE & TENNEY, P.S.**
230 South Second Street · P.O. Box 22680
Yakima, WA 98907-2680
Telephone (509) 575-8500

### 2.    The Blaises Will Likely Prevail on Compelled Speech.

As an explicit condition of securing a foster parent license, the Department mandates that applicants explicitly agree with the Department's LGBTQ+ policies, including those supporting hormone therapy for transition purposes. "It is, however, a basic First Amendment principle that freedom of speech prohibits the government from telling people what they must say." *Agency for Int'l Dev. v. All. For Open Soc'y Int'l, Inc.*, 570 U.S. 205, 213 (2013). The First Amendment's guarantee of "freedom of speech" includes "both what to say and what not to say." *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796-97 (1988). For this reason, a state neither can "compel the endorsement of ideas that it approves." *Knox v. Service Employees*, 567 U.S. 298, 309 (2012), nor force an individual "to be an instrument for fostering public adherence to an ideological point of view he finds unacceptable," *Wooley v. Maynard*, 430 U.S. 705, 714-15 (1977).

In *Janus v. AFSCME*, the Supreme Court decried the "damage" created by compelled speech. "In that situation, individuals are coerced into betraying their convictions" which is "always demeaning." 138 S. Ct. 2448, 2464 (2018); Vikram Amar & Alan Brownstein, *Toward A More Explicit, Independent, Consistent and Nuanced Compelled Speech Doctrine*, 2020 U. Ill. L. Rev. 1, 23 (noting the "particular affront to human dignity when individuals are required to take a stand in a . . . public policy debate by supporting a position they oppose on moral or political grounds". ) For this reason, "[c]ompelling individuals to mouth support for views they find objectionable violates that cardinal constitutional command,

LAW OFFICES OF
**MEYER, FLUEGGE & TENNEY, P.S.**
230 South Second Street · P.O. Box 22680
Yakima, WA 98907-2680
Telephone (509) 575-8500

and in most contexts, any such effort would be universally condemned." *Janus*, 138 S. Ct. at 2463.

Here, the Department's effort to compel speech from the Blaises is unmistakable. The Department extensively questioned the Blaises on three occasions about hypothetical issues related to H.V.'s possible future sexual orientation and gender identity. Each time, the only satisfactory answers the Department would accept were responses that endorsed the Department's LGBTQ+ policies. The sole reason given by the Department in denying the Blaises' application was that the Blaises could not support the Department's LGBTQ+ policy because it does not align with their faith. This included not only their refusal to support hormone treatment years down the road, but also because the Blaises would not agree to call H.V. by a name other than her legal name or use pronouns that are inconsistent with H.V's birth sex. These Department requirements are precisely the sort of "pledge allegiance to the Government's policy" that the First Amendment prohibits. *Agency for Int'l Dev.*, 570 U.S. at 220; *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) ("[N]o official . . . can prescribe what shall be orthodox in . . . religion, or other matters of opinion or force citizens to confess by word or act their faith therein.")

That the Department interjected its LGBTQ+ policy as the criteria for measuring whether the Blaises satisfy minimum licensing requirements is of no matter. States do not have "unfettered power to reduce a group's First Amendment rights by simply imposing a licensing requirement." *NIFLA v. Becerra*, 138 S. Ct. 2361, 2375 (2018). Deploying regulatory authority to stifle disfavored speech

**Amended Motion for Preliminary and Permanent Injunction - 16**

LAW OFFICES OF
**MEYER, FLUEGGE & TENNEY, P.S.**
230 South Second Street · P.O. Box 22680
Yakima, WA 98907-2680
Telephone (509) 575-8500

"pose[s] the inherent risk that the Government seeks not to advance a legitimate regulatory goal, but to suppress unpopular ideas or information." *Id.* at 2374 (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641 (1994)).*Rumsfeld v. FAIR, Inc.*, 547 U.S. 47, 59 (2006) (government "may not deny a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech, even if he has no entitlement to that benefit.")

The particular speech at issue—relating to "sexual orientation and gender identity"—addresses "sensitive political topics . . . of profound 'value and concern to the public.'" *Janus*, 138 S. Ct. at 2476 (quoting *Snyder v. Phelps*, 562 U.S. 443, 453 (2011)). "[S]uch speech occupies the highest rung of the hierarchy of First Amendment values and merits special protection." *Id.* By demanding that the Blaises jettison their deeply held religious convictions on such subjects and instead express a commitment to the Department's position, the government has engaged in the coarsest form of compelled speech. "Governments must not be allowed to force persons to express a message contrary to their deepest convictions. Freedom of speech secures freedom of thought and belief. This [conduct] imperils those liberties." *NIFLA*, 138 S. Ct. at 2379 (Kennedy, J., concurring).

**B. The Blaises Have Suffered Irreparable Harm.**

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Cate v. Oldham*, 707 F.2d 1176, 1188-89 (11th Cir. 1983) ("Direct penalization of First Amendment rights constitutes irreparable injury."). Thus, "no further showing of irreparable injury is necessary." *Planned Parenthood Ass'n of*

**Amended Motion for Preliminary and Permanent Injunction - 17**

1    *Utah v. Herbert*, 828 F.3d 1245, 1263 (10th Cir. 2016) (citation omitted). But

2    further harm does exist. Without a license, the Blaises are barred from even being

3    considered as foster parents for their own great-granddaughter at this crucial

4    moment in her young life, even though Idaho, which currently has custody, would

5    not insist on the avowals that Washington now requires. The Blaises' inability even

6    to be considered as foster parents for H.V., based on what might happen some 15

7    years down the road, significantly exacerbates the harm to the constitutional rights.

8         **C.    The Balance of Equities Favors the Blaises.**

9         The Department, on the other hand, can offer nothing but theoretical fears as

10   its alleged harms. Its only concern is that LGBTQ+ children may suffer severe

11   harm if they not do not receive unquestioning support from their caregivers. Those

12   issues are entirely unrelated to the Blaises willingness to provide loving care to an

13   infant, especially a member of their family. Even with a preliminary injunction, the

14   Department remains free to administer its policy. At most, it would need to

15   accommodate the Blaises' sincerely-held religious beliefs by not placing an

16   LGBTQ+ teen in their care. Placing H.V. or other infants in their care requires no

17   such accommodation; at only nine months old, H.V. has not developed gender

18   dysphoria or exhibited any other sexual orientation issues. And considering the

19   significant need that Washington has for additional foster families, the Department

20   cannot reasonably claim that it will be harmed by accommodating the Blaises

21   religious beliefs.

22

23

**Amended Motion for Preliminary**
**and Permanent Injunction - 18**

LAW OFFICES OF
**MEYER, FLUEGGE & TENNEY, P.S.**
230 South Second Street · P.O. Box 22680
Yakima, WA 98907-2680
Telephone (509) 575-8500

1

### D. The Public Interest Favors Protecting First Amendment Rights.

2      Here, there is no "critical public interest that would be injured by the grant

3  of preliminary relief." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127,

4  1138 (9th Cir. 2011). "[I]t is always in the public interest to prevent the violation

5  of a party's constitutional rights." *Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir.

6  2012). And given that H.V. is an infant, there is no cognizable danger that

7  licensing the Blaises to serve as her foster parents in any way will undercut the

8  Department's LGBTQ+ policies. Finally, protecting the Blaises' constitutional

9  rights ensures that others will not "be deterred, even if imperceptibly, from

10 exercising those rights in the future." *Cate*, 707 F.2d at 1176, 1188-89. All of

11 society, and especially foster children in need of loving homes, will benefit from

12 preserving the ability of people of all faiths to provide foster care services.

13               ### V.    CONCLUSION

14     For all the reasons set forth above, this Court should enter an injunction

15 requiring the Department to grant the Blaises' foster parent application.

16

17

18

19

20

21

22

23

**Amended Motion for Preliminary**
**and Permanent Injunction - 19**

LAW OFFICES OF
**MEYER, FLUEGGE & TENNEY, P.S.**
230 South Second Street · P.O. Box 22680
Yakima, WA 98907-2680
Telephone (509) 575-8500

RESPECTFULLY SUBMITTED this 6th day of July, 2020.

                    s/ Jerome R. Aiken                    .
JEROME R. AIKEN, WSBA #14647
Attorneys for Plaintiffs
James Blais and Gail Blais
Meyer, Fluegge & Tenney, P.S.
Phone: 509/575-8500 – Fax: 509/575-4676
Email: aiken@mftlaw.com

                    s/ Todd R. McFarland                    .
TODD R. McFARLAND
General Conference of Seventh-day Adventists
Attorneys for Plaintiffs
James Blais and Gail Blais
Phone: 301/680-6321; Fax: 301/680-6329
Email: McFarlandT@adventist.org

                    s/ Andrew G. Schultz                    .
ANDREW G. SCHULTZ, NM No. 3090
Rodey, Dickason, Sloan, Akin & Robb, P.A.
Attorneys for Plaintiffs
James Blais and Gail Blais
Phone: 505/765-5900; Fax: 505/768-7395
Email: aschultz@rodey.com

LAW OFFICES OF
**MEYER, FLUEGGE & TENNEY, P.S.**
230 South Second Street · P.O. Box 22680
Yakima, WA 98907-2680
Telephone (509) 575-8500

1

## CERTIFICATE OF TRANSMITTAL

2

I hereby certify under penalty of perjury of the laws of the state of Washington that on July 6, 2020, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF System and also caused said document to be personally served on the following parties as described below:

3

4

| | |
|---|---|
| **For Plaintiffs James and Gail Blais:** | |
| Mr. Todd R. McFarland, Associate General Counsel | _X_  via CM/ECF |
| General Conference of Seventh-Day Adventists | |
| 12501 Old Columbia Pike | |
| Silver Spring, MD  20904 | |
| McFarlandT@adventist.org | |
| | |
| Mr. Andrew G. Schultz | |
| Rodey, Dickason, Sloan, Akin & Robb, P.A. | _X_  via CM/ECF |
| P.O. Box 1888 | |
| Albuquerque, NM  87103 | |
| aschultz@rodey.com | |
| **For Defendant Ross Hunter:** | |
| Mr. Jeffrey C. Grant, Assistant Attorney General | _X_  via CM/ECF |
| Office of the Attorney General | |
| 88 Fifth Avenue, Suite 2000 | |
| Seattle, WA  98104 | |
| Jeffrey.grant@atg.wa.gov | |
| **For Defendant Ross Hunter:** | |
| Ms. Carrie Hoon Wayno, Assistant Attorney General | X_  via CM/ECF |
| Mr. Drew Pugsley, Assistant Attorney General | |
| Office of the Attorney General | |
| 7141 Cleanwater Drive SW / P.O. Box 40124 | |
| Olympia, WA  98504-0124 | |
| Carrie.Wayno@atg.wa.gov | |
| Drew.Pugsley@atg.wa.gov | |

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

/s  Sheryl A. Jones                                    .
SHERYL A. JONES, Legal Assistant
Meyer, Fluegge & Tenney, P.S.
jones@mftlaw.com

21

22

23

**Amended Motion for Preliminary
and Permanent Injunction - 21**

LAW OFFICES OF
**MEYER, FLUEGGE & TENNEY, P.S.**
230 South Second Street · P.O. Box 22680
Yakima, WA 98907-2680
Telephone (509) 575-8500