Ryan C. Castle (WSBA #46601)
CASTLE LAW FIRM
1313 East Maple Street, Suite 213
Bellingham, Washington 98225
(360) 685-4260

Daniel J. Shih (WSBA #37999)
SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, Washington 98101
(206) 373-7390

*Attorneys for Amici Curiae
Center for Children & Youth Justice,
Mockingbird Society, and Amara*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| JAMES BLAIS and GAIL BLAIS,<br><br>  Plaintiffs,<br>  v.<br><br>ROSS HUNTER, in his official capacity of Secretary of Washington State Department of Children, Youth and Families,<br><br>  Defendant. | No. 2:20-cv-00187-SMJ<br><br>***AMICI CURIAE* BRIEF OF THE CENTER FOR CHILDREN & YOUTH JUSTICE, MOCKINGBIRD SOCIETY, AND AMARA**<br><br>Hearing: July 16, 2020 |

*AMICI CURIAE* BRIEF OF CCYJ,
MOCKINGBIRD SOCIETY, AND AMARA          1

# TABLE OF CONTENTS

I. INTRODUCTION ..........................................................................................3

II. IDENTITY AND INTERESTS OF *AMICI*....................................................4

III. BACKGROUND............................................................................................6

IV. ARGUMENT .................................................................................................8

    A. LGBTQ+ youth make up a significant portion of foster youth.....................................................................................................8

    B. Safe and affirming care, including with respect to LGBTQ+ identities, is critical to the health, safety, and well-being of foster youth. ...................................................................................10

    C. Even for young children, caregivers must be able to address the development of LGBTQ+ identities to prevent harm and provide safe and affirming care. ...........................................................14

V. CONCLUSION............................................................................................17

The Center for Children & Youth Justice (CCYJ), Mockingbird Society, and Amara (together, "*Amici*") offer this *amici curiae* brief in opposition to Plaintiffs' Amended Motion for Preliminary and Permanent Injunction (ECF No. 31) ("Motion").

## I. INTRODUCTION

Children who are lesbian, gay, bisexual, transgender, queer, and/or questioning (LGBTQ+) are disproportionately more likely to be involved in child welfare and juvenile justice systems. Whether they grow up in their family's care or a foster home, LGBTQ+ individuals' experiences of intolerance and abuse far too often begin at home. As a result, many LGTBQ+ youth are forced into homelessness where they are in further danger of harassment and violence. Nationwide, 40% of homeless youth identify as LGBTQ+, nearly half of whom are homeless due to family rejection. Many then enter the juvenile justice system, where LGBTQ+ youth can become caught in a cycle of discrimination and abuse. It is a systemic problem that requires systemic solutions.

The State of Washington has made the welfare and safety of LGBTQ+ youth a priority. The State rightly seeks to ensure that state-sanctioned caregivers will protect and affirm the children in their care, regardless of a child's sexual orientation or gender identity.

## II. IDENTITY AND INTERESTS OF *AMICI*

*Amici curiae* are three not-for-profit organizations dedicated to serving and improving outcomes for children in the foster care system.

The Center for Children & Youth Justice ("CCYJ") was founded by former Washington State Supreme Court Justice Bobbe Bridge in 2006 with a singular mission: to reform the foster care and youth justice systems to improve the lives of children and youth. CCYJ identifies gaps and cracks in those systems, develops innovative approaches to mending problems, and then ensures that policymakers embed those reforms into practices and procedures. The results of CCYJ's work are put into state law, adopted as standing protocols by courts and schools, and developed into new treatments and interventions for at-risk, abused, or neglected children and their families. Taking a holistic view of the problems at-risk families and children face, CCYJ has facilitated integrated solutions through projects including:

- **empowering foster and homeless youth** by building pathways to education, housing, and employment;

- **keeping kids in school** by activating education and justice communities to support youth in crisis;

- **reducing gang violence** by uniting partners to redirect gang-involved youth and get them on a positive path;

- **keeping children out of foster care** by connecting families in crisis to support teams;
- **supporting LGBTQ+ youth** by building capacity for foster care and juvenile courts to provide safe, affirming support; and
- **combating child sexual exploitation** by connecting exploited children to resources and advocacy.

The Mockingbird Society, founded in 2000, has a mission to transform foster care and end youth homelessness. By working in partnership with young people who have lived through the systems it is transforming, Mockingbird changes policies, perceptions, and practices that stand in between any young person and a safe, supportive, and stable home. Forty-four percent of Mockingbird's youth advocates identify as LGBTQ+, with 8% identifying as transgender. Every Mockingbird advocate has experienced foster care or homelessness, and 62% have experienced both.

Amara, founded in 1921, works to ensure that every child in foster care has the love and support of a committed family—as quickly as possible and for as long as each child needs. Amara's programs include providing emergency sanctuaries to children recently removed from their home for their own safety; preparing and supporting families willing to provide a stable, long-term, loving home for children in foster care; providing post-adoption services to support stable and fulfilling

family relationships; and raising awareness of children in foster care to increase community-wide support for youth and families.

## III. BACKGROUND

Seven years ago, CCYJ launched the eQuality project, a multi-phased initiative to create lasting reform for LGBTQ+ youth within the child welfare and juvenile justice systems.[1] In the project's initial phase, CCYJ gathered first-hand accounts from LGBTQ+ adults that grew up in these systems; collected service providers' observations about their experiences working with LGBTQ+ youth; and extensively reviewed the existing research, laws, policies, and practices relevant to system-involved LGBTQ+ youth.[2] These efforts culminated with the publication of CCYJ's *Listening to Their Voices* report in 2015.[3]

---

[1] Nicholas Oakley, Center for Children & Youth Justice, *Protocol for Safe & Affirming Care* 4 (Jan. 2017), https://ccyj.org/wp-content/uploads/2017/03/Protocol-for-Safe-Affirming-Care.pdf.

[2] *Id.* at 11.

[3] Sara Ganzhorn et al., Center for Children & Youth Justice, *Listening to Their Voices: Enhancing Successful Outcomes for LGBTQ Youth in Washington State's Child Welfare and Juvenile Justice Systems* (Feb. 2015), https://ccyj.org/wp-content/uploads/2017/03/ListeningToTheirVoices.pdf.

In the eQuality project's second phase, CCYJ worked with hundreds of professionals, caregivers, youth, and other stakeholders—including judges and court administrators, child welfare organizations, law enforcement agencies, child and family service providers, public schools, and state, local, and tribal governments—to develop the *Protocol for Safe & Affirming Care*.[4] The Protocol serves as a guide for youth-serving professionals in the foster care and juvenile justice systems to better identify, engage, and serve LGBTQ+ youth while simultaneously collecting data on their needs, experiences, and outcomes. In 2017, CCYJ piloted implementation of the Protocol in King and Spokane Counties, working with county administrators to provide training for professionals working with youth, refer youth who identify as LGBTQ+ to appropriate services, and introduce questions about sexual orientation and gender identity to intake procedures.[5] Following that successful pilot, the State developed and implemented its current statewide policy on LGBTQ+ foster youth.

---

[4] Oakley, *supra* note 1, at 5–10 (listing participants).

[5] MEMconsultants, LLC, *CCYJ eQuality Project: Final Evaluation Report* 2 (Aug. 2018), https://ccyj.org/wp-content/uploads/2018/08/CCYJ-eQuality-Final-Evaluation-Report-Aug-2018.pdf.

*AMICI CURIAE* BRIEF OF CCYJ,
MOCKINGBIRD SOCIETY, AND AMARA          7

## IV. ARGUMENT

Once in the child welfare system, many LGBTQ+ youth experience significant mistreatment including discrimination, abuse, harassment, and other trauma at the hands of caretakers, system professionals, and peers. When youth are placed in unaccepting homes, the placement is very likely to be unsuccessful. The State's intake process properly seeks to ensure that potential foster parents are able to provide a safe and affirming environment, regardless of how a child's sexual orientation or gender identity eventually develops.

### A. LGBTQ+ youth make up a significant portion of foster youth.

A significant portion of foster youth will identify as LGBTQ+. Indeed, studies of foster youth confirm that a much higher proportion identify as LGBTQ+ than in the general population. A study of Los Angeles foster youth found that "there are between 1.5 to 2 times as many LGBTQ youth living in foster care as LGBTQ youth estimated to be living outside of foster care."[6] A national survey determined that "approximately 22.8 percent of children in out-of-home care

---

[6] Bianca D.M. Wilson et al., Williams Institute at UCLA School of Law, *Sexual and Gender Minority Youth in Foster Care: Assessing Disproportionality and Disparities in Los Angeles* 6 (Aug. 2014), https://williamsinstitute.law.ucla.edu/wp-content/uploads/SGM-Youth-in-Foster-Care-Aug-2014.pdf.

AMICI CURIAE BRIEF OF CCYJ,
MOCKINGBIRD SOCIETY, AND AMARA      8

identified as LGBQ (lesbian, gay, bisexual or questioning)"—and this figure understates the LGBTQ+ population because it does not capture youth who may identify as transgender or gender expansive.[7] For comparison, a California-wide study found that 30.4% of youth living in foster care self-identified as "LGBTQ."[8]

In short, any foster care system must recognize not only that many of its youth are LGBTQ+, but also that such youth are overrepresented in the system. This is driven in part by family rejection and violence causing LGBTQ+ youth to enter out-of-home care; but it is also driven by LGBTQ+ youth (especially transgender youth) being less likely to achieve permanence through reunification or

---

[7] Megan Martin et al., Center for the Study of Social Policy, *Out of the Shadows: Supporting LGBTQ Youth in Child Welfare Through Cross-System Collaboration* 8 (2016), https://cssp.org/wp-content/uploads/2018/08/Out-of-the-Shadows-Supporting-LGBTQ-youth-in-child-welfare-through-cross-system-collaboration-web.pdf.

[8] Laura Baams et al., *LGBTQ Youth in Unstable Housing and Foster Care*, 143 PEDIATRICS e20174211, at 1 (2019), https://pediatrics.aappublications.org/content/pediatrics/143/3/e20174211.full.pdf.

*AMICI CURIAE* BRIEF OF CCYJ, MOCKINGBIRD SOCIETY, AND AMARA          9

adoption and thereby spending more time in the foster care system.[9] It is therefore critical for Washington's system to address the needs of such youth.

### B. Safe and affirming care, including with respect to LGBTQ+ identities, is critical to the health, safety, and well-being of foster youth.

The social science confirms what may seem axiomatic—that "[p]ositive parental and familial relationships are crucial for youth well-being."[10] This extends to having positive relationships with respect to LGBTQ+ identities. Studies of LGBTQ+ youth have consistently shown the importance of parental support of their sexual orientation and gender expression.[11] Family support and acceptance are associated with a litany of improved outcomes, including greater self-esteem, better health, less depression, lower substance abuse, less suicidal ideation, and fewer suicide attempts among LGBTQ+ youth.[12]

---

[9] Wilson, *supra* note 6, at 11–12 (citing studies).

[10] Stephen T. Russell & Jessica N. Fish, *Mental Health in Lesbian, Gay, Bisexual, and Transgender (LGBT) Youth*, 12 ANN. REV. CLINICAL PSYCHOL. 465, 473 (Mar. 2016).

[11] *Id.* at 474–75 (citing studies).

[12] *Id.*; Sabra L. Katz-Wise et al., *Lesbian, Gay, Bisexual, and Transgender Youth and Family Acceptance*, 63 PEDIATRIC CLINICS N. AM. 1011 (Dec. 2016),

On the flipside, when parents or caregivers reject LGBTQ+ identity, the impact can be devastating. When they become young adults (ages 21–25), LGBTQ+ individuals who encountered a high level of rejection by parents or caregivers during their teenage years are more than eight times as likely to have attempted suicide, nearly six times as likely to report high levels of depression, more than three times as likely to use illegal drugs, and more than three times as likely to be at high risk for HIV and sexually transmitted diseases.[13] For transgender youth, being forbidden to use one's chosen name was associated with substantially higher rates of depression and a doubling in the rate of suicidal behavior.[14]

---

https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5127283/pdf/nihms823230.pdf (at 8 of manuscript); Caitlin Ryan et al., *Family Acceptance in Adolescence and the Health of LGBT Young Adults*, 23 J. OF CHILD & ADOLESCENT PSYCHIATRIC NURSING 205, 210–11 (Nov. 2010), https://onlinelibrary.wiley.com/doi/epdf/10.1111/j.1744-6171.2010.00246.x.

[13] Catlin Ryan, *Generating a Revolution in Prevention, Wellness & Care for LGBT Children & Youth*, 23 TEMPLE POLITICAL & CIVIL RIGHTS L. REV. 331, 338 (2014).

[14] Stephen T. Russell et al., *Chosen Name Use Is Linked to Reduced Depressive Symptoms, Suicidal Ideation, and Suicidal Behavior Among Transgender Youth*, 63

AMICI CURIAE BRIEF OF CCYJ,
MOCKINGBIRD SOCIETY, AND AMARA            11

CCYJ's own research has confirmed that many foster youth in Washington encounter lack of support and outright mistreatment from their foster families as a result of their LGBTQ+ identities. Most participants in CCYJ's *Voices* study reported mistreatment by at least one foster family, such as physical abuse, sexual abuse, public humiliation, ejection from the home, and other forms of direct hostility toward their LGBTQ+ identity.[15] Further, even foster parents who do not commit such acts can create an environment where LGBTQ+ foster youth feel unsupported and not respected. Many participants did not feel comfortable disclosing their LGBTQ+ identity to their foster families, fearing how their foster parents would react. Some participants had foster families who taught them that being LGBTQ+ was wrong or would result in them going to hell.[16]

Even people that consider themselves loving and well-meaning can fail to provide a supportive and affirming environment for LGBTQ+ youth and can bring about negative outcomes. Parents and caregivers often do not understand how

---

J. ADOLESCENT HEALTH 503 (Oct. 2018), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6165713/pdf/nihms945849.pdf (at 3 of manuscript).

[15] Ganzhorn, *supra* note 3, at 21–22.

[16] *Id.*

LGBTQ+ youth experience their reactions. As one study notes, issues arise from common behaviors that, whether or not intended to cause harm, are experienced as rejection. Such behaviors include "not talking about or discouraging an adolescent from talking about their LGBT identity or denying and minimizing an adolescent's LGBT identity"—often manifested in such expressions as "it's just a phase," "he'll grow out of it," "how could she possibly know?," or "they're just confused." In fact, such reactions are "tied to an increased risk of depression, illegal drug use, suicidality, and sexually transmitted diseases."[17]

Further, to truly improve outcomes for foster youth, merely avoiding rejection and mistreatment is just the start. LGBTQ+ youth need active support and affirmation. According to one study, family behaviors found to improve mental and physical health include supporting a child's LGBTQ+ identity and gender expression, bringing them to LGBTQ+ organizations or events, welcoming their LGBTQ+ friends into the home and at family events and activities, and working to make one's faith community supportive of LGBTQ+ members.[18]

The social science evidence on outcomes is clear. Foster children who identify as LGBTQ+ need foster families who are supportive and affirming,

---

[17] Ryan, *supra* note 13, at 338.

[18] Ryan, *supra* note 12, at 211.

including with respect to their LGBTQ+ identities. As a state agency entrusted with the welfare of minors, the Department of Children, Youth, and Families rightly favors foster parents who can provide such an environment.

### C. Even for young children, caregivers must be able to address the development of LGBTQ+ identities to prevent harm and provide safe and affirming care.

Even young children can know their sexual orientation and gender identity and be harmed by the lack of safe and affirming care. Studies of lesbian, gay, and bisexual youth indicate that they are usually aware of their sexual orientation by their early teens, if not sooner. One study found that the average age of self-identification of sexual orientation was 13.4 years, and many children self-identify between ages 7 and 12.[19]

Gender identity is commonly expressed at an even earlier age, most often by age 3.[20] And it is often expressed in no uncertain terms. A study of transgender

---

[19] Substance Abuse and Mental Health Services Administration, *A Practitioner's Resource Guide: Helping Families to Support Their LGBT Children*, HHS Pub. No. PEP14-LGBTKIDS, at 3 (2014), https://familyproject.sfsu.edu/sites/default/files/FamilySupportForLGBTChildrenGuidance.pdf.

[20] *Id.*

children between the ages of 3 and 12 found that "transgender children strongly identify as members of their current gender group and show gender-typed preferences and behaviors that are strongly associated with their current gender, not the gender typically associated with their sex assigned at birth."[21]

Early affirmation of a child's gender identity, including through social transition, makes a big difference. A "social transition" is a nonmedical decision to allow a child to change their first name, pronouns, hairstyle, and clothing to live everyday life as their asserted gender. A study of transgender children between the ages of 9 and 14 found that children who had socially transitioned reported levels of depression comparable to (and only marginally higher rates of anxiety than) a control group. By comparison, gender-nonconforming children who had not socially transitioned faced much higher rates of depression and anxiety relative to the control group, "with more than 50% of older children falling in the clinical range of internalizing symptoms."[22]

---

[21] Selin Gülgöz et al., *Similarity in Transgender and Cisgender Children's Gender Development*, 116 PROCEEDINGS OF THE NAT'L ACAD. OF SCI. 24480, 24480 (2019), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6900519/.

[22] Lily Durwood et al., *Mental Health and Self-Worth in Socially Transitioned Transgender Youth*, 56 J. AM. ACAD. OF CHILD & ADOLESCENT PSYCHIATRY 116

In short, foster children are likely to become aware of their sexual orientation and gender identity as young children—that is, while in foster care. Foster parents must be prepared to understand, address, and support LGBTQ+ identities to prevent harm and provide safe and affirming care. Plaintiffs' "alternatives" to such a policy (*see* ECF No. 31, at 11) would compromise child welfare, which is and should remain the paramount consideration. The suggestion that the Department "could address the issue [of LGBTQ+ identity] at a later, more appropriate age" is an illusion; there is no age at which recognizing LGBTQ+ identity is inappropriate, and there is no age by which such identity is always known. And the idea that caseworkers could provide the affirmation and support that plaintiffs refuse to, or that foster placements may be changed after a foster child identifies as LGBTQ+, is damaging to child welfare. Foster youth already face enough challenges, and they do best with supportive foster families and stable placements. There is no reasonable alternative to ensuring foster parents provide supportive and affirming care with respect to LGBTQ+ identities.

---

(2017), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5302003/ (at 2 of manuscript).

*AMICI CURIAE* BRIEF OF CCYJ,
MOCKINGBIRD SOCIETY, AND AMARA                16

## V. CONCLUSION

For the foregoing reasons, *Amici* respectfully ask this Court to deny Plaintiffs' Motion.

DATED August 10, 2020

Respectfully submitted,

*/s/ Daniel J. Shih*
Daniel J. Shih (WSBA #37999)
SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, Washington 98101-3000
Telephone: (206) 373-7390
Facsimile: (206) 516-3883
Email: dshih@susmangodfrey.com

Ryan C. Castle (WSBA #46601)
CASTLE LAW FIRM
1313 East Maple Street, Suite 213
Bellingham, Washington 98225
Telephone: (360) 685-4260
Email: ryan@ryancastlelawfirm.com

*Attorneys for Amici Curiae*
*Center for Children & Youth Justice,*
*Mockingbird Society, and Amara*