FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Oct 08, 2020

SEAN F. McAVOY, CLERK

1

2

3            UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF WASHINGTON
4

5   JAMES BLAIS and GAIL BLAIS,        No.    2:20-cv-00187-SMJ

                      Plaintiffs,      **ORDER GRANTING IN PART**
6                                      **AND DENYING IN PART**
                                       **PLAINTIFFS' MOTION FOR**
7        v.                            **PRELIMINARY AND**
                                       **PERMANENT INJUNCTION**
8   ROSS HUNTER, in his official
    capacity of Secretary of Washington
9   State Department of Children, Youth
    and Families,
10
                      Defendant.
11

12        James and Gail Blais hope to foster, and eventually adopt, their great-

13   granddaughter, H.V. After H.V. was born, concerns about her welfare arose. The

14   Idaho Department of Health and Welfare ("IDHW") ultimately removed H.V. from

15   her birth parents' care and later reached out to the Blaises about possibly fostering

16   or adopting her. The Blaises expressed an interest in caring for H.V., so IDHW

17   asked the Washington Department of Children, Youth, and Families

18   ("Department") to evaluate the Blaises for a foster care license.

19        To address the needs of foster children who are developing, discovering, or

20   identifying themselves as lesbian, gay, bisexual, transgender and questioning

(LGBTQ+),[1] the Department has promulgated several regulations and policies for Department staff and foster parents providing foster care services. The Blaises are devout Seventh-day Adventists. Following a home study, the Department denied the Blaises' foster care license application. Their answers to a series of hypotheticals involving a foster child who might in the future develop or identify as LGBTQ+ did not conform to Department regulations and policy.

The Blaises sued under 42 U.S.C. § 1983, seeking declaratory and injunctive relief. They allege Department regulations and policies on LGBTQ+ youth work to preclude people with certain sincerely held religious beliefs from qualifying for a foster care license. They maintain that these regulations and policies in operation violate the First and Fourteenth Amendments of the United States Constitution. The Blaises thus moved for a preliminary and permanent injunction.

After reviewing the briefing, and conducting a hearing on the matter, the Court issued an oral ruling granting in part and denying in part the Blaises' motion for a preliminary injunction. Because the Blaises declined to address whether a permanent injunction should issue, the Court did not reach that question. This written order memorializes the Court's oral ruling.

---

[1] The Court recognizes that the letter Q in this abbreviation can stand for "questioning," or "queer," or sometimes both. That said, the Department policy and guidance at issue uses Q to denote "questioning," and the Court refers to it that way here simply to maintain consistency.

ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR PRELIMINARY AND PERMANENT INJUNCTION – 2

## BACKGROUND

In September 2019, Gail Blais's granddaughter gave birth to H.V. ECF No. 30 at 6. Soon after, worries about her welfare arose. *Id*. Hospital staff contacted IDHW. *Id*. IDHW ultimately removed H.V. from her birth parents and placed her in foster care. *Id*. In December, IDHW contacted the Blaises about H.V., who expressed an interest in fostering and possibly adopting their great-granddaughter. *Id*.; ECF No. 32 at 3.

In early January, the Blaises applied for a foster care license; IDHW also asked the Department to evaluate whether the Blaises would be fit foster parents for H.V. ECF No. 25 at 12. The Department assigned their application to Patrick Sager, a foster care licensor. *Id*. About a week later, Sager went to the Blaises' home to conduct the required interviews and home study. *Id*.

The Department's Licensing Division completes homes studies for all caregivers who foster children in their custody. ECF No. 20-1 at 3. The Department encourages licensors to ask questions available in the Family Home Study Guide and related Family Home Study Questions and Prompts. ECF No. 25 at 7; *see also* ECF Nos. 20-1, 20-2. Sager asked the Blaises many questions about things involving the Blaises' family history, past spouses, experience with children, communication styles, dietary habits, medical and mental health issues, employment history, and corporal punishment. ECF No. 32 at 4; ECF No. 25 at 7.

ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS'
MOTION FOR PRELIMINARY AND PERMANENT INJUNCTION – 3

Though only an infant, Sager also asked hypothetical questions about H.V.'s possible future sexual orientation and gender identity. ECF No. 32 at 4; *see also* ECF No. 20-2 at 4. These questions included, for example:

- "How would we react if H.V. was a lesbian?"
- "Would we allow H.V. to have a girl spend the night at our home as H.V.'s romantic partner?"
- "If at 15 years old, H.V. wanted to undergo hormone therapy to change her sexual appearance, would we support that decision and transport her for those treatments?"
- "If as a teenager, H.V. wanted to dress like a boy and be called by a boy's name, would we accept her decision and allow her to act in that manner?"

ECF No. 32 at 4; *see also* ECF No. 20-2 at 4; ECF No. 25 at 10.

The Blaises informed Sager that their Christian faith obliges them to love and support all people. ECF No. 32 at 4–5. They conveyed that this tenet especially applies to children who may feel isolated or uncomfortable. *Id*. As for the specific questions on possible hormone therapy, they "responded that although we could not support such treatments based on our sincerely-held religious convictions, we absolutely would be loving and supportive of H.V." *Id*. at 5. They "also indicated that, in the unlikely event H.V. may develop gender dysphoria (or any other medical condition) as a teenager, we would provide her with loving, medically and therapeutically appropriate care that is consistent with both then-accepted medical principles and our beliefs as Seventh-day Adventists and Christians." *Id*.

Their answers alarmed Sager. ECF No. 25 at 12. He advised them that the

ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS'
MOTION FOR PRELIMINARY AND PERMANENT INJUNCTION – 4

Department would likely deny their application because their responses conflicted with the Department's policy to support LGBTQ+ children. ECF No. 32 at 4–5.

> For example, they were not willing (a) to support hormone therapy for transitioning, even if it was medically necessary or recommended, or counseling that was not consistent with their religious beliefs; (b) to support boys wearing girls' clothes or vice versa; (c) to allow H.V. or other foster children to date in the future; or (d) to call a foster child by their preferred name if it was different from their given name.

ECF No. 25 at 12–13.

After apprising his supervisor, they decided to send the Blaises educational materials and statistics about LGBTQ+ children. *Id*. at 13, 14. The email invited them to review the materials, so that they could "make a more informed decision about supporting LGBTQ+ youth in foster care." ECF No. 32 at 6.

Meanwhile, the Department also mailed the Blaises' adult children questionnaires to get more information about their parenting. *Id*. One question probed, "If you needed someone to care for your child, either short or long-term, would you feel comfortable using the applicant(s)?" James Blais's son responded,

> Short term, yes. I would be hesitant for something long term as I have different religious views than my father and I wouldn't necessarily want that environment for my child for the long term. I raised my daughter that no religion is perfect and not having religion in your life is fine as well. It's ultimately an individual's choice and my father has stringent religious views concerning same-sex marriage, inter-racial marriages and relationships in general.

*Id*. at 13–14. Sager later declared that this provided him with independent proof that "Blaises' [lacked the] ability to adequately support all foster children." *Id*. at 14.

ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS'
MOTION FOR PRELIMINARY AND PERMANENT INJUNCTION – 5

After reading the materials provided, the Blaises reiterated their sincerely held religious beliefs and repeated their pledge to offer a loving and supportive home for any foster child in their care. ECF No. 32 at 6. Still, they held steadfast to their conviction that they would not support hormone treatment for a child wishing to transition. ECF No. 32 at 6. Sager then posed new but similar questions to the Blaises:

- "If H.V. had a lesbian girlfriend, would we be willing to have her visit our home and possibly travel with us?"
- "Would we find it acceptable if H.V. dressed like a boy?"
- "Would we find it acceptable if H.V. wanted to be called by a boy's name?"
- "If at age 14, a doctor ordered H.V. to undergo hormone therapy to change her sexual appearance, would we comply with that order?"
- "If at age 14, H.V. said that if we did not agree with her having hormone therapy she would leave our home and run away, how would we respond?"

ECF No. 32 at 7. Afterward, Sager again suggested that they abandon their request to become H.V.'s foster parents because their answers still conflicted with Department policy—the Blaises refused. *Id.*

Several days later, Sager asked the Blaises to meet with him yet again, this time via videoconference with the Department's LGBTQ+ lead, Carissa Stone. *Id.*; ECF No. 25 at 15. They agreed. *Id.* During that call, they "discussed Policy 6900, which is [the Department's] policy on how [Department] staff will make sure children who identify as LGBTQ+ have safe and affirming care." ECF No. 21 at 5.

ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS'
MOTION FOR PRELIMINARY AND PERMANENT INJUNCTION – 6

Because the Blaises remained faithful to their beliefs, Sager and Stone advised them that they had reached an "impasse." *Id*.; ECF No. 21 at 6.

The Blaises sued for declaratory and injunctive relief under 42 U.S.C. § 1983, alleging the Department violated the First and Fourteenth Amendments of the United States Constitution. ECF No. 1. They then moved for a preliminary and permanent injunction. ECF No. 3. The Department moved to dismiss the action because the Blaises failed to exhaust their administrative remedies, among other reasons. ECF No. 17.

Soon after, the Department denied their application for a foster care license in a letter-ruling. ECF No. 25-4. The decision noted,

> Despite the Department's multiple efforts to educate the Blaise's [sic] about the risks to the safety of foster children who identify as LGBTQ+ presented by family rejection and a lack of family support, they have been unwilling to agree to provide safe and affirming support to a child who is or may identify as LGBTQ+.

*Id*. at 7. The decision also notified the Blaises about how to file an administrative appeal. *Id*. at 9.

The Blaises declined to administratively appeal, instead opting to amend their complaint in federal court. ECF No. 30. That amendment rendered the Department's motion to dismiss moot. ECF No. 34. The Blaises also amended their motion for a preliminary and permanent injunction. ECF No. 31.

The Blaises seek declaratory and injunctive relief, alleging that Department

regulations and policies violate the First and Fourteenth Amendments of the United States Constitution as-applied by (1) encouraging individualized assessments, (2) targeting the religious for special disabilities, (3) operating in a non-neutral way, (4) compelling speech, (5) flouting substantive due process, (6) violating hybrid rights under the First Amendment, and (7) imposing unconstitutional conditions. ECF No. 30 at 24–34.

The Blaises ask the Court to declare certain Department regulations and policies unconstitutional. ECF No. 30 at 34. They also request a mandatory injunction forcing the Department to grant the Blaises' foster care license. *Id*. Finally, they seek to enjoin the Department from enforcing or threatening to enforce Policy 6900 or any other policy, regulation, or practice that conflicts with a foster care license applicant's sincerely held religious beliefs about sexual orientation or gender identity. *Id*. at 34–35.

Though entitled "Amended Motion for Preliminary and Permanent Injunction," the Blaises only offer legal argument on whether a preliminary injunction should issue. *See generally* ECF No. 31. And the sole relief requested in this motion is an "injunction requiring the Department to grant the Blaises' foster parent application." *Id*. at 20. For these reasons, the Court addresses only whether the Blaises satisfied the standard for a preliminary injunction.[2]

---

[2] The Department also highlights this defect and thus addresses only whether the

ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR PRELIMINARY AND PERMANENT INJUNCTION – 8

**DISCUSSION**

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "[P]laintiffs must establish that irreparable harm is *likely*, not just possible, in order to obtain a preliminary injunction." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (emphasis in original).

Even so, the Ninth Circuit employs a "sliding scale approach." *All. for the Wild Rockies*, 632 F.3d at 1131. Under that approach, "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *Id*. Thus, "a preliminary injunction could issue where the likelihood of success is such that 'serious questions going to the merits were raised and the balance of hardships tips sharply in [plaintiff's] favor.'" *Id.* (alterations in original) (quoting *Clear Channel Outdoor, Inc. v. City of Los Angeles*, 340 F.3d 810, 813 (9th Cir. 2003)). "The 'serious questions' approach survives *Winter* when applied as part of the four-element *Winter* test." *Id*. at 1131–32. Still, "[w]hen the government is a party, the[] last two factors merge." *Drakes*

Court should issue a preliminary injunction. ECF No. 43 at 10. At oral argument, the Blaises likewise confirmed they were seeking only a preliminary injunction.

ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR PRELIMINARY AND PERMANENT INJUNCTION – 9

*Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

**A.      Likelihood of Success on the Merits**

**1.      Free Exercise Challenge**

The free exercise clause provides that "Congress shall make no law . . . prohibiting the free exercise [of religion]." U.S. Const., amend. I.; *see also Cantwell v. State of Conn.*, 310 U.S. 296, 303 (1940) (holding that the First Amendment's free exercise clause applies to the states through the Fourteenth Amendment). "The free exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires." *Emp. Div., Dep't of Hum. Res. of Or. v. Smith*, 494 U.S. 872, 877 (1990). Thus, "[t]he government may not compel affirmation of religious belief, punish the expression of religious doctrines it believes to be false, impose special disabilities on the basis of religious views or religious status, or lend its power to one or the other side in controversies over religious authority or dogma." *Id.* (citations omitted).

But "[n]ot all burdens on religion are unconstitutional," and "[t]he state may justify a limitation on religious liberty by showing that it is essential to accomplish an overriding governmental interest." *United States v. Lee*, 455 U.S. 252, 257 (1982). The right to free exercise does not relieve a person from complying with a valid, neutral law of general applicability. *Smith*, 494 U.S. at 879.

ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS'
MOTION FOR PRELIMINARY AND PERMANENT INJUNCTION – 10

1    Courts apply two levels of scrutiny to laws that allegedly burden religion

2    under the free exercise clause. On the one hand, courts apply "the most rigorous of

3    scrutiny" to laws burdening religion that are neither neutral nor of general

4    application. *Lukumi*, 508 U.S. at 546. Such laws will be found unconstitutional

5    unless the government can show the law serves "a compelling interest and is

6    narrowly tailored to advance that interest." *Lukumi*, 508 U.S. at 533. On the other

7    hand, courts apply rational basis review to neutral laws of general applicability.

8    *Stormans, Inc. v. Wiesman*, 794 F.3d 1064, 1075–76 (9th Cir. 2015). "Under

9    rational basis review, we must uphold the rules if they are rationally related to a

10   legitimate governmental purpose." *Id*. at 1084.

### i.    Neutrality

12   The Blaises argue Department regulations and policies operate in a non-

13   neutral manner thus suppressing religious belief. *See generally* ECF No. 31 at 8–

14   14; ECF No. 46 at 3–7. The Department counters its regulations and policies operate

15   neutrally because they apply equally to all foster care license applicants. ECF No.

16   43 at 12.

17   A law is not neutral if "the object of [the] law is to infringe upon or restrict

18   practices *because of* their religious motivation." *Lukumi*, 508 U.S. at 533 (emphasis

19   added). Plaintiffs may show "that the object or purpose of a law is the suppression

20   of religion or religious conduct" in several ways. *Id*. But courts will first examine

ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS'
MOTION FOR PRELIMINARY AND PERMANENT INJUNCTION – 11

1    the law's text to determine whether it is discriminatory on its face. *Id*. "A law lacks

2    facial neutrality if it refers to a religious practice without a secular meaning

3    discernable from the language or context." *Id*. Besides the text, how the law works

4    in practice supplies "strong evidence of its object." *Id*. at 535.

5        In denying the Blaises license application, the Department relied on Wash.

6    Rev. Code §§ 74.15.010, 74.15.030, 74.15.130, 49.60.030; Wash. Admin. Code §§

7    110-148-1365, 110-148-1520, 110-148-1625; and Department Policies 4520,[3]

8    5100, 6900. ECF 25-4 at 5–8.

9        Wash. Rev. Code § 74.15.010 provides a declaration of purpose. Under

10    Washington law, legislative policy declarations have no operative effect. *See*, *e.g.*,

11    *Judd v. Am. Tel. & Tel. Co.*, 95 P.3d 337, 341 (Wash. 2004) (holding

12    policy statements do not give rise to enforceable rights and duties). So, while this

13    policy declaration may shed light on the aims of the chapter's operative laws, it

14    cannot provide a basis for the Department to deny the Blaises' foster care license

15    application.

16        Wash. Rev. Code § 74.15.030 gives the secretary the power and duty to adopt

---

[3] The Court notes that Policy 4520 addresses HIV/AIDS Support Services and does
not contain the language referenced in the Department's letter ruling. *Compare* ECF
25-4 at 5 n.1 *with* Policy 4520, *HIV/AIDS Support Services*, Washington State
Department of Children, Youth & Families (last visited October 2, 2020),
https://www.dcyf.wa.gov/4500-specific-services/4520-hivaids-support-services.
The Court cannot locate the proper policy the Department intended to reference, so
it cannot address it here.

ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS'
MOTION FOR PRELIMINARY AND PERMANENT INJUNCTION – 12

and publish minimum requirements for licensing, investigate any person's character, suitability, and competence to provide foster care, and issue, revoke, or deny licenses, among other things.

Wash. Rev. Code § 74.15.130 allows the Department to deny a license if an applicant has failed or refused to comply with the provisions of chapter 74.15 RCW or the requirements promulgated under the provisions of chapter 74.15 RCW, among other things.

Wash. Rev. Code § 49.60.030 declares freedom from discrimination to be a civil right and prohibits discrimination in the workplace, public accommodations, real estate transactions, credit transactions, insurance transaction, and the like.

Wash. Admin. Code § 110-148-1365 outlines the "personal" requirements for foster parents. Among other things, potential foster parents must show that they can "furnish children with a nurturing, respectful, and supportive environment." *Id*. Similarly, Wash. Admin. Code § 110-148-1520 outlines the services the Department expects potential foster parents to provide to children in their care. For example, foster parents "must follow all state and federal laws regarding nondiscrimination while providing services to children in [their] care . . . [and] must treat foster children in [their] care with dignity and respect regardless of race, ethnicity, culture, sexual orientation and gender identity." Wash. Admin. Code § 110-148-1520(6). Foster parents must also "connect a child with resources that

meets a child's needs regarding race, religion, culture, sexual orientation and gender identity." Wash. Admin. Code § 110-148-1520(7).

Policy 5100 provides: "Children's Administration (CA) is prohibited from denying any person the opportunity to become a foster or adoptive parent, on the following basis: race, creed, color, national origin, gender, honorably discharged veteran or military status, sexual orientation, or the presence of any sensory, mental, or physical disability or the use of a trained dog guide or service animal." Connie Lambert-Eckel, *Applying as a Foster Parent or Unlicensed Caregiver*, Washington State Department of Children, Youth & Families (July 1, 2018), https://www.dcyf.wa.gov/5000-case-support/5100-applying-foster-parent-or-unlicensed-caregiver.

Policy 6900 provides: "A child or youth who identifies as LGBTQ+ will not be subjected to discrimination or harassment on the basis of actual perceived sex, sexual orientation, gender identity or gender expression." Connie Lambert-Eckel, *Supporting LGBTQ+ Identified Children and Youth*, Washington State Department of Children, Youth & Families (July 1, 2018), https://www.dcyf.wa.gov/6000-operations/6900-supporting-lgbtq-identified-children-and-youth.

The purpose of the policy is

[t]o address the specific needs of children and youth under the age of 21 receiving Children's Administration (CA) services who are developing, discovering, or identifying themselves as lesbian, gay, bisexual, transgender and questioning (LGBTQ+). This policy will

1
2
provide guidance to assist CA staff in identifying and referring LGBTQ+ children and youth to appropriate and culturally responsive services.

3
*Id.*

4
Because the statutes, regulations and policies at issue "make no reference to

5
any religious practice, conduct, belief, or motivation, they are facially neutral."[4] *See*

6
*Stormans*, 794 F.3d at 1076. "A regulation neutral on its face may, in its application,

7
nonetheless offend the constitutional requirement for governmental neutrality if it

8
unduly burdens the free exercise of religion." *Wisconsin v. Yoder*, 406 U.S. 205,

9
220 (1972). Because the free exercise clause "'forbids subtle departures from

10
neutrality,'" *Lukumi*, 508 U.S. at 533 (quoting *Gillette v. United States*, 401 U.S.

11
437, 452 (1971)), the tougher question here involves whether these regulations and

12
policies operate to covertly suppress certain religious beliefs. *See id*. Courts must

13
carefully review how the law works in practice to thwart "religious gerrymanders."

14
*Id.*

15
*Lukumi* identified three factors courts should focus on when determining

16
whether a law works as a religious gerrymander, including whether: (1) the law

17

18
19
20
---
[4] Some Department guidance documents explicitly reference religion. ECF Nos. 20-1, 20-2. The Family Home Study Questions and Prompts offers a series of questions licensors may ask about an applicant's religious and spiritual affiliations and practices. ECF No. 20-2 at 7. That guidance document is also the source of questions prompting inquiry into an applicant's stances on support of LGBTQ+ youth. ECF No. 20-2.

ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS'
MOTION FOR PRELIMINARY AND PERMANENT INJUNCTION – 15

1    burdens religious objectors yet almost no others, (2) the government's interpretation

2    of the law favors secular conduct, and (3) the law bars "more religious conduct than

3    is necessary to achieve [its] stated ends." *See id*. at 536–538.

4        Chapter's 110–148 of the Washington Administrative Code govern the

5    licensing requirements for child foster homes. The regulations here do not

6    reasonably accommodate religious belief or conduct for foster care providers. *See*,

7    *e.g.*, Wash. Admin. Code § 110-148-1365, 1520. Still, these regulations do apply

8    equally to all prospective foster care applicants. *See id*. For example, by requiring

9    a foster parent to "connect a child with resources that meets a child's needs

10    regarding race, religion, culture, sexual orientation and gender identity," Wash.

11    Admin. Code § 110-148-1520(7), the Department ostensibly did not intend to

12    infringe or restrict any particular religious beliefs or conduct *because of* their

13    religious motivations. *See Lukumi*, 508 U.S. at 533. Rather, the Department

14    intended that regulation, and others like it, to protect the best interests of children

15    in foster care. There is also no evidence the Department promulgated these

16    regulations with discriminatory intent.

17        Even so, in defining the scope of Policy 6900, the Department states: "This

18    policy applies to CA [Children's Administration] staff." Lambert-Eckel, *supra*. Yet

19    Pamela McKeown, senior foster care administrator at the Department, declares:

20        Policy 6900 applies to DCYF Licensing Division staff (including those
        who conduct home studies for foster care licensing applications and

ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS'
MOTION FOR PRELIMINARY AND PERMANENT INJUNCTION – 16

ICPC requests), and provides that a child or youth who identifies as LGBTQ+ will not be subjected to discrimination or harassment on the basis of actual or perceived sex, sexual orientation, gender identity, or gender expression.

ECF No. 23 at 10. The Department relied on Policy 6900 in its ruling denying the Blaises' foster care license application. ECF 25-4 at 5 n.1.

It appears in practice the Department applies Policy 6900 to prospective foster parents. *See id*. By its terms, though, Policy 6900 applies only to Department staff, not foster care applicants. *See* Lambert-Eckel, *supra*. And it applies only to a child or youth who *identifies* as LGBTQ+. *See id*. The policy does not authorize the Department to impose its staff mandates on potential foster parents. *See id*. Nor does it apply to children who are not within the Department's custody and care or children who hypothetically might identify as LGBTQ+ in the future. *See id*. Nor does it impose any separate foster parent licensing requirement under which applicants must comply. *See id*.

Closer inspection of the regulations and policies at issue reveals that, in practice, they work to burden potential caregivers with sincere religious beliefs yet almost no others. *See Lukumi*, 508 U.S. at 536. For the most part, the only foster care applicants who might object to supporting certain issues LGBTQ+ children might face will likely do so on religious grounds.

The Department's interpretation of its regulations and policies also favor certain secular viewpoints over certain religious viewpoints. *See Lukumi*, 508 U.S.

ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR PRELIMINARY AND PERMANENT INJUNCTION – 17

at 537. For example, the Department favors religious and non-religious applicants who have neutral or pro-LGBTQ+ views over religious and non-religious applicants who have non-neutral or anti-LGBTQ+ views. Several open-ended regulations and policies give the Department broad discretion—case-by-case—to prohibit people from participating in foster care because their sincere religious beliefs conflict with Department LGBTQ+ policy. Department guidance gives licensors "flexibility to ask different or additional questions in order to make the home study process more accessible as well as to ensure that any areas of concern are fully developed and can be thoroughly assessed." ECF No. 20-2 at 1; ECF No. 25 at 11. While these regulations and policies' secular purpose assuredly have the best interests of children at heart, in practice, these laws work to preclude people with certain religious beliefs from participating in foster care.

Finally, Department policy operates to bar more religious conduct than necessary to achieve its stated ends. *See Lukumi*, 508 U.S. at 538. The Department's stated ends include furnishing foster children with a nurturing, respectful, and supportive environment; treating foster children with dignity and respect regardless of sexual orientation and gender identity; and connecting foster children with resources that meet their needs. Wash. Admin. Code §§ 110-148-1365, 1520(6), (7). The regulations and policies at issue are overbroad as applied to the Blaises given many available alternatives. As the Blaises suggest, for instance, the

1  Department

> could address the issue at a later, more appropriate age. It could rely
> on caseworkers to carry out medical decisions that the Blaises cannot
> support for religious reasons. Or it could change placements in the rare
> situation where the Blaises might be unable, consistent with the
> religious beliefs, to carry out the Department's decisions with respect
> to a particular child.

ECF No. 31 at 12.

Here, approval of the Blaises' application hinged on their stance on LGBTQ+ rights and whether they intended to remain faithful to their religion. The Blaises believe "Scripture provides guidance to those who experience incongruity between their biological sex and gender identity." ECF No. 31 at 4. The Department denied their application because this tenet of the Blaises' faith flouts Department regulations and policy, as interpreted by Department staff. The Department thus "punish[ed] the expression of religious doctrines it believes to be false." *Smith*, 494 U.S. at 877; *see also Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 449 (1988) (the free exercise clause protects against laws that "penalize religious activity by denying any person an equal share of the rights, benefits, and privileges enjoyed by other citizens"); *United States v. Ballard*, 322 U.S. 78, 86–88 (1944). But the Blaises' "'religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection.'" *See Lukumi*, 508 U.S. at 531 (quoting *Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 714 (1981)). Yet, to be eligible for a foster care license, the Department

ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS'
MOTION FOR PRELIMINARY AND PERMANENT INJUNCTION – 19

required the Blaises to divorce themselves from their religious beliefs. *See Espinoza*
*v. Montana Dep't of Revenue*, 140 S. Ct. 2246, 2255–56 (2020) (determining
Montana's no-aid provision bars religious schools and religious parents from public
benefits just because of the religious character of the schools). "Placing such a
condition on benefits or privileges 'inevitably deters or discourages the exercise of
First Amendment rights.'" *Id*.

The Department argues the purpose of the foster family home licensing
program is to "safeguard the health, safety, and well-being of children, . . . which is
paramount over the right of any person to provide care." Wash. Rev. Code §
74.15.010(1). And "no person or agency has a right to be licensed under this chapter
to provide care for children." 1995 Wash. Sess. Laws, 1271–80. True enough, but
the Department undeniably grants a privilege and benefit to the foster parents who
receive a license. The Department denied the Blaises the privilege and benefit of
providing foster care because of their sincerely held religious beliefs.

In its ruling denying the Blaises application, the Department also invoked
Wash. Rev. Code § 49.60.030 and Policy 5100 as a basis for denying the Blaises
application. ECF No. 25-4 at 5–6. Curious, as the Blaises had not actually
discriminated against any child in their care, but instead simply answered
hypothetical questions about hypothetical children. That aside, the Department
ignored how the law and policy actually work to protect the Blaises. Wash. Rev.

ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS'
MOTION FOR PRELIMINARY AND PERMANENT INJUNCTION – 20

Code § 49.60.030 declares the right to be free from discrimination because of creed. Policy 5100 likewise prohibits the Department from denying any person the opportunity to become a foster or adoptive parent based on their creed. *See* Lambert-Eckel, *supra*. Yet the Department ostensibly discriminated against the Blaises based on their creed. It denied the Blaises' application because their system of religious beliefs, as Seventh Day Adventists, do not align with Policy 6900 and other guidance. The Court recognizes the inherent tension between these laws and policies and notes that the Department has not issued any guidance for licensors attempting to navigate situations where there is a conflict between a foster care applicant's creed or religious beliefs and the Department's policy of supporting LGBTQ+ youth. !

Department regulations and policies appear neutral but in practice gerrymander to create unequal effect. As applied to the Blaises and others similarly situated, the regulations and policies disproportionately exclude persons who observe certain religious faiths from qualifying as foster parents based solely on speculative future conduct. In operation, Department regulations and policies eliminate a not insignificant cross-section of otherwise qualified persons from serving as potential caregivers based on their faith's stance on sexual orientation and gender identity and whether their religion supports certain issues LGBTQ+ youth might face.

ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR PRELIMINARY AND PERMANENT INJUNCTION – 21

The Court concludes Department regulations and policy operate as a religious gerrymander and are thus not neutral as applied to the Blaises and others similarly situated.

### ii. General Applicability

Though interrelated, and the failure to satisfy the neutrality requirement likely shows a law does not satisfy the general applicability requirement, courts must analyze each principle separately. *Stormans*, 794 F.3d at 1076. A law generally applies if it does not selectively "impose burdens only on conduct motivated by religious belief." *Lukumi*, 508 U.S. at 543. The Blaises argue Department regulations and policies create a discretionary system of individualized assessments and target the religious for special disabilities based on their religious views.

### a. Individualized Assessments

*Sherbert v. Verner*, 374 U.S. 398 (1963), and its progeny *Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707 (1981), and *Hobbie v. Unemp. Appeals Comm'n of Fla.*, 480 U.S. 136 (1987), held incidental burdens on the free exercise of religion must be narrowly tailored to achieve a compelling state interest. *Smith* ostensibly restricted the scope of this line of cases by delimiting the use of strict scrutiny to a few categories of cases, including when the government has a discretionary system of "individualized . . . assessment." 494 U.S. at 873. Strict

scrutiny thus applies whenever the government denies a request for religious accommodation under "circumstances in which individualized exemptions from a general requirement are available." *Lukumi*, 508 U.S. at 537. When applicable rules give state actors "unfettered discretion" unrestricted by "particularized, objective criteria," courts apply strict scrutiny. *See Stormans*, 794 F.3d at 1081–82.

As discussed above, several open-ended regulations and policies give the Department broad discretion—case-by-case—to determine whether a person qualifies for a foster care license. And Department guidance gives licensors "flexibility to ask different or additional questions in order to make the home study process more accessible as well as to ensure that any areas of concern are fully developed and can be thoroughly assessed." ECF No. 20-2 at 1; ECF No. 25 at 11.

The Department argues "the licensing rules are generally applicable and contain no exceptions that apply only to secular conduct." ECF No. 43 at 20. But Department guidance undermines this argument: "A holistic assessment is essential to achieve the intent of each section and make final recommendations regarding placement and permanency for children. All families are unique; these questions are not one size fits all." ECF No. 20-2. Department guidance thus envisions "circumstances in which individualized exemptions from a general requirement are available." *See Lukumi*, 508 U.S. at 537. The Department encourages licensors to consider an applicant's religious beliefs and stances on LGBTQ+ rights, and a

ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS'
MOTION FOR PRELIMINARY AND PERMANENT INJUNCTION – 23

distinctive feature of the foster care licensing process is the licensor's subjective assessment of various criteria.

Department regulations and policies force the Blaises into a dilemma: adhere to their religion and give up the benefit of a foster care license or forsake their religion and get a foster care license. *See Sherbert*, 374 U.S. at 404. Because such regulations and policies involving individualized assessments impose substantial burdens on religious exercise, the Court concludes strict scrutiny applies to protect free exercise rights from governmental encroachment. *See id*. The regulations and policies here do not generally apply because the Department selectively imposes burdens on only certain religious beliefs at odds with its policy to support LGBTQ+ youth. *See Lukumi*, 508 U.S. at 543.

**b.    Special Disabilities**

In addition, "[t]he Free Exercise Clause 'protect[s] religious observers against unequal treatment' and subjects to the strictest scrutiny laws that target the religious for 'special disabilities' based on their 'religious status.'" *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2019 (2017) (quoting *Lukumi,* 508 U.S. at 533)); *see also Smith*, 494 U.S. at 877 (reiterating the free exercise clause protects against the government's imposition of "special disabilities on the basis of religious views or religious status").

In *Trinity Lutheran*, for example, the Supreme Court addressed a Missouri

state constitutional provision that prohibited the state from giving public benefits to religious institutions. 137 S. Ct. at 2017. The church applied to participate in a state program that gave grants to nonprofit organizations that repaved surfaces with material made from recycled tires. *Id*. The state pointed out that declining to issue the grant to the church in no way infringed on its religious exercise and noted that it had no duty to give the grant in the first place. *Id*. at 2021–22. But the Court disagreed:

> [T]he Department's policy puts Trinity Lutheran to a choice: It may participate in an otherwise available benefit program or remain a religious institution. Of course, Trinity Lutheran is free to continue operating as a church, just as McDaniel was free to continue being a minister. But that freedom comes at the cost of automatic and absolute exclusion from the benefits of a public program for which the Center is otherwise fully qualified. And when the State conditions a benefit in this way, *McDaniel* says plainly that the State has punished the free exercise of religion: "To condition the availability of benefits ... upon [a recipient's] willingness to … surrender[] his religiously impelled [status] effectively penalizes the free exercise of his constitutional liberties."

*Id*. (quoting *McDaniel v. Paty*, 435 U.S. 618, 626 (1978)). The Court emphasized it "has repeatedly confirmed that denying a generally available benefit solely on account of religious identity imposes a penalty on the free exercise of religion that can be justified only by a state interest 'of the highest order.'" *Id*. at 2019. *Trinity Lutheran* thus reaffirms that the government may not impose special disability or withhold government benefits because of one's religion. *See id*; *see also McDaniel*, 435 U.S. at 626; *Sherbert*, 374 U.S. at 406.

ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR PRELIMINARY AND PERMANENT INJUNCTION – 25

Like the policy at issue in *Trinity Lutheran*, the Department's policy at issue here puts the Blaises to a choice: They may participate in an otherwise available benefit program but only if they disavow their religious beliefs. *See id*. at 2021–22. The Blaises are obviously free to worship as Seventh Day Adventists, just as Trinity Lutheran was free to keep operating as a church. *See id*. But that freedom comes with a cost: abandoning the chance to receive foster care license. *See id*. *Trinity Lutheran* makes clear "that such a policy imposes a penalty on the free exercise of religion that triggers the most exacting scrutiny." *Id*. at 2021.

### iii.    Strict Scrutiny

Because the regulations and policies at issue operate as a religious gerrymander, target the religious for individualized assessments, and impose special disabilities on certain religious views, the law is neither neutral nor generally applicable in this case. The Court therefore concludes strict scrutiny applies.

"A law failing to satisfy these requirements must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest." *See Lukumi,* 508 U.S. at 531–32. Still, "[t]he state may justify an inroad on religious liberty by showing that it is the least restrictive means of achieving some compelling state interest." *Thomas*, 450 U.S. at 718. "The least-restrictive-means standard is exceptionally demanding," *see Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 728 (2014), and it is not satisfied here.

As the Blaises point out,

> [t]he Department permissibly could address LGBTQ+ concerns at the placement stage, rather than at licensing. *See* Policy 6900; WAC 110-148-1520. It could address the issue at a later, more appropriate age. It could develop a case plan for the child to authorize medical decisions that the Blaises cannot support for religious reasons. (Resp. at 13.) Or it could change placements in the rare situation where the Blaises might be unable, consistent with the religious beliefs, to carry out the Department's decisions with respect to a particular child.

ECF No. 46 at 5. The Department has not shown that it lacks other ways to achieve its desired goal without imposing a substantial burden on the Blaises' exercise of religion. For these reasons, the Blaises have raised serious questions going to the merits of their free exercise claim.[5] *See All. for the Wild Rockies*, 632 F.3d at 1131.

## B.    Likelihood of Irreparable Injury

The Department claims that the Blaises have not shown irreparable harm because they have no right to a foster care license and have failed to exhaust their administrative remedies. The Court disagrees.

First, even if they have no right a foster care license, the free exercise clause protects against laws that "penalize religious activity by denying any person an equal share of the rights, benefits, and privileges enjoyed by other citizens." *Lyng*, 485 U.S. at 449. Other Washingtonians may apply for the privilege and benefit of

---

[5] Because the regulations and policies at issue fail strict scrutiny as applied to the Blaises, the Court declines to reach their other arguments involving compelled speech, substantive due process, hybrid constitutional rights, and unconstitutional conditions.

ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR PRELIMINARY AND PERMANENT INJUNCTION – 27

becoming a foster parent. Penalizing the Blaises for their religious beliefs violates the free exercise clause by denying them an otherwise publicly available privilege or benefit. *See generally Trinity Lutheran*, 137 S. Ct. 2012.

Second, exhaustion of administrative remedies is not a prerequisite to an action under § 1983. *Patsy v. Bd. of Regents of State of Fla.*, 457 U.S. 496, 500–01, 516 (1982).

More importantly, though, the Blaises have suffered an irreparable injury: "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *See*, *e.g.*, *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Associated Press v. Otter*, 682 F.3d 821, 826 (9th Cir. 2012). By denying their application for a foster license, they have also possibly lost the chance to provide foster care for their great-granddaughter, H.V. IDHW is apparently moving forward with having H.V. adopted by her current nonfamilial foster family. The Department's adverse ruling has hampered the Blaises' relationship with their great-granddaughter—an irreparable injury to be sure.

## C.    Balancing the Equities and Public Interest

When the government is a party, the balance of equities and public interest factors merge. *Drakes*, 747 F.3d at 1092. To determine the balance of equities, courts must "balance the interests of all parties and weigh the damage to each." *Stormans*, 586 F.3d at 1138 (citation omitted).

ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS'
MOTION FOR PRELIMINARY AND PERMANENT INJUNCTION – 28

1    While the Court recognizes that the Department has an important interest in

2    protecting foster children in its care and ensuring LGBTQ+ youth have supportive,

3    understanding foster parents, the Ninth Circuit has consistently "recognized the

4    significant public interest in upholding First Amendment principles." *Doe v. Harris*,

5    772 F.3d 563, 583 (9th Cir. 2014) (quoting *Sammartano v. First Jud. Dist. Ct.,* 303

6    F.3d 959, 974 (9th Cir. 2002)). Since the Blaises have raised serious First

7    Amendment questions, the law requires a finding that the balance of hardships tips

8    sharply in their favor. *See, e.g., Am. Beverage Ass'n v. City & Cnty. of San*

9    *Francisco*, 916 F.3d 749, 758 (9th Cir. 2019); *Cmty. House, Inc. v. City of Boise*,

10    490 F.3d 1041, 1059 (9th Cir. 2007). The Court concludes that the constitutional

11    free exercise rights at stake therefore outweigh the also very important interests the

12    Department has in protecting LGBTQ+ youth.

## CONCLUSION

14    In sum, the Court determines the Blaises have satisfied the *Winter* criteria

15    governing preliminary injunctions. *See* 555 U.S. at 20. They have raised serious

16    questions going to the merits of their free exercise claim; they have also shown

17    irreparable injury and that the balance of hardships tips sharply in their favor. *See*

18    *All. for the Wild Rockies*, 632 F.3d at 1131. The Court therefore grants in part and

19    denies in part the motion for a preliminary injunction. The Court enjoins the

Department from using Policy 6900 against prospective foster parents.[6] The Court finds the policy's plain language applies only to Department staff and protects only foster children who have already identified as LGBTQ+. The policy's plain language does not apply to foster care license applicants or children who might in the future identify as LGBTQ+.

That said, the Court does not enjoin the Department from taking LGBTQ+ considerations into account when reviewing foster care license applications. But a foster care applicant's answers to LGBTQ+ hypotheticals cannot serve as the *sole* determining factor when an applicant expresses sincerely held religious beliefs. It must base its decision on something more. If the only factor weighing against an otherwise qualified applicant has to do with their sincerely held religious beliefs, the Department must not discriminate against a foster care applicant based on their creed. *See* Wash. Rev. Code § 49.60.030; Lambert-Eckel, *supra*, Policy 5100. The Department must make reasonable accommodations for religion—especially in

---

[6] The Court also enjoins Department July 2018 Policy Roll Out Questions & Answers to the extent inconsistent with this order. *See* ECF No. 25-4 at 5 n.1 ("LGBTQ, questions 4, page 3: 'LGBTQ+ identities are discussed during the home study process. If there is a concern that the potential foster parents would not be able to appropriately meet the needs of any child or youth for any reason, they should be 'counseled out' or the home study denied. The WAC requires that state and federal laws regarding nondiscrimination must be followed.' (RCW 49.60.030)"). The Department must make reasonable accommodations for religion as discussed in this order and must not discriminate against foster care applicants based on their creed. *See* Wash. Rev. Code § 49.60.030; Lambert-Eckel, *supra*, Policy 5100.

ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR PRELIMINARY AND PERMANENT INJUNCTION – 30

cases like this one where the potential placement involves a biological family member. As Department guidance suggests, it must evaluate each applicant holistically: "All families are unique; these questions are not one size fits all." ECF No. 20-2.

The Department flags that the Blaises must still complete their application by submitting to fingerprint-based background checks and completing other training to qualify for a foster care license. ECF No. 25 at 17–18. As a result, the Court denies the Blaises request for a mandatory injunction forcing the Department to issue them a license. The Court vacates the Department's ruling denying the Blaises application for a foster care license. The Court remands to the Department to allow the Blaises time to complete their outstanding application requirements and for further consideration and reevaluation of the Blaises application consistent with this order. The Court finds it would be premature to reach whether a permanent injunction should issue.

Accordingly, **IT IS HEREBY ORDERED**:

1.    The Blaises' Amended Motion for Preliminary and Permanent Injunction, **ECF No. 31**, is **GRANTED IN PART** and **DENIED IN PART** as described above.

2.    The Department is hereby **ENJOINED** from using Policy 6900, and any other Department policy or guidance inconsistent with this order,

against prospective foster care license applicants.

3.    The Blaises' request for a mandatory injunction forcing the Department to issue them a license is **DENIED**.

4.    The Department's ruling denying the Blaises' application for a foster care license is **VACATED**.

5.    This case is **REMANDED** to the Department for further proceedings consistent with this Order.

**IT IS SO ORDERED.** The Clerk's Office is directed to enter this Order and provide copies to all counsel.

**DATED** this 7TH day of October 2020.

SALVADOR MENDOZA, JR.
United States District Judge